UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

DARREN GABRIEL LACHANCE,

                Petitioner,

    v.

PERRY RUSSELL,[1] *et al.,*

                Respondents.

Case No. 3:17-cv-00689-MMD-WGC

ORDER

## I.    SUMMARY

Petitioner Darren LaChance filed a *pro se* petition for writ of habeas corpus under 28 U.S.C. § 2254. (ECF No. 1 ("Petition").) This matter is now before the Court for adjudication on the merits of the remaining grounds in LaChance's Petition. The Court grants the Petition in part and denies it in part.

## II.    BACKGROUND

In 2012, a jury convicted Darren LaChance of, *inter alia*: (1) domestic battery by strangulation; (2) domestic battery causing substantial bodily harm; (3) false imprisonment; and (4) possession of a controlled substance for purposes of sale. (ECF Nos. 19-9; 20-39.)

LaChance challenges his convictions on the grounds that (a) insufficient evidence supports the verdict for the domestic battery convictions, and (b) counsel's failure to

---

[1]It appears from the state corrections department's inmate locator page that LaChance is currently incarcerated at the Northern Nevada Correctional Center ("NNCC"). *See* https://ofdsearch.doc.nv.gov/form.php (retrieved September 2021, under identification number 75693). The department's website reflects that Perry Russell is warden of that facility. *See* https://doc.nv.gov/Facilities/NNCC_Facility/ (retrieved September 2021). At the end of this order, the Court directs the Clerk of Court to substitute LaChance's current immediate physical custodian, Perry Russell, as Respondent for the prior Respondent Harold Wickham, pursuant to, *inter alia*, Rule 25(d) of the Federal Rules of Civil Procedure.

request lesser-included-offense instructions and investigate and present the victim's Facebook messages constituted ineffective assistance of counsel. (ECF No. 1.)

The evidence available to the State of Nevada at the time of LaChance's trial tended to establish the following:[2]

The victim, Starleen Lane, testified she met LaChance when he was "bouncing" at Sierra Tap House, and they moved into her apartment as boyfriend and girlfriend.[3] (ECF No. 19-5 at 32-34, 80.) LaChance's friend, C.J., later moved in with them. (*Id.* at 81.)

Lane testified she had an argument with LaChance at 4:00 a.m. when he returned home after a three-day-gambling spree on March 11, 2012. (*Id.* at 35-36, 81-83.) Lane said she slept on the couch until she was awakened by an argument between LaChance and C.J. (*Id.* at 35–37, 83.) She said LaChance and C.J. had a shoving match during which LaChance hit her on the forehead with a flashlight, which later produced a knot. (ECF Nos. 19-5 at 35-37, 86-87; 19-7 at 12.) Lane said LaChance and C.J. argued, while she sat on the couch holding her head, until C.J. left for work. (ECF No. 19-5 at 37, 89.)

After C.J. left for work, Lane said LaChance, who was angry and yelling, grabbed her by the arm and "flung" her onto the bed in their bedroom.[4] (*Id.* at 37-38, 89-90.) She said LaChance called her a "bitch" and a "whore," told her she "better talk" or he was going to "kill" her, and threatened to "wreck" her face and "punch out" her teeth. (*Id.* at 38.) Lane testified that LaChance slapped her ear causing her "immediate hearing loss" and nausea, and punched her arms, buttocks, hips, ribs, thighs, and "the side of her

---

[2]The Court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact in the state court. The Court summarizes the same solely as background to issues presented in this case, and it does not summarize all such material. No assertion of fact made in describing statements, testimony, or other evidence in the state court constitutes a finding by this Court. Omission of a specific piece of evidence or category of evidence in this overview, or elsewhere describing background in this order, does not signify that the Court overlooked the evidence in considering LaChance's claims.

[3]Booking information reflects his occupation as "bouncer." (ECF No. 18-3 at 17.)

[4]The jury saw LaChance and Lane in-person at trial. The June 14, 2012 Pretrial Services Assessment Report reflects LaChance was 6' 1" and weighed 193 pounds. (ECF No. 18-2 at 4.) Lane testified that she is 5' 4" tall. (ECF No. 19-5 at 109.)

breasts." (*Id.* at 38-40, 47.) She said she tried to leave but LaChance threatened to kill her if she escaped, and grabbed her face, threw her back onto the bed, and "got on top of" her. (*Id.* at 38.)

According to Lane's testimony, when LaChance got on top of her, her head was hanging off the bed, his knee was in the middle of her chest, and his entire weight held her down with "full force." (*Id.* at 38, 41-42, 95-96.) While he was holding her down, Lane said LaChance pressed "the lower part" of her "neck" or "collar bone," while he screamed, called her names, and threatened to kill her. (*Id.* at 38, 41-42, 53, 94-96, 108.) Lane testified that at one point her air was cut off, and her breathing impeded. (ECF Nos. 19-5 at 53, 95-96, 102; 19-7 at 13-15.) She said she was anxious, dizzy, and "faint-ish." (ECF Nos. 19-5 at 95-96; 19-7 at 15.) She also said she saw "stars" and "little white spots" in her eyes and thought she was "on the verge of passing out." (ECF Nos. 19-5 at 38, 41, 53, 95-96; 19-7 at 15.) Lane's written statement to police, given at the emergency room, stated LaChance "grabbed my throat and squeezed while he shook my head and said, 'I'm going to fucking kill you, I swear to God, bitch' [and] with one hand holding me down by the throat, he slapped me . . . ." (ECF Nos. 19-7 at 65-67; 19-8 at 20-24.)

Lane further testified that she tried to wiggle away but LaChance was "too strong." (ECF No. 19-5 at 38.) She said LaChance "whacked" her knee and wrist with a flashlight, and threatened to break her wrists, ankle, and foot. (*Id.* at 38, 40.) When she screamed, she said LaChance pressed his hand over her mouth "putting great pressure," and told her it wasn't "going to be good" for her if someone heard her scream and police came to her aid. (*Id.* at 38-39.) She said LaChance kicked her shin, and when she assumed a fetal position, LaChance kicked her tailbone. (*Id.* at 39.) Lane claimed that when she tried to leave the bed, LaChance stomped on her feet. (*Id.*) She explained she was unable to call for help because LaChance withheld her phone and when she went to grab his phone, he took his phone away. (*Id.* at 42.)

The beating, according to Lane, occurred "for a good couple of hours" until LaChance went to the bathroom, at which point, Lane "jumped off the bed," "yanked" open

the patio door, scaled the four-foot-tall patio wall as fast as she could, landed on her hands and feet, and ran. (ECF Nos. 19-5 at 42-44, 108-111; 19-7 at 17-18.) Lane said she was "scared for [her] life," "had so much adrenaline" and had a "split-second" window to escape. (ECF Nos. 19-5 at 43, 109; 19-7 at 17.) Lane further testified LaChance gave chase, caught up to her in the parking lot, shoved her into landscape rocks, grabbed her wrists, and demanded she return to the apartment. (ECF No. 19-5 at 43-44, 113-15.)

A neighbor, Maryann Ritter, testified she heard a woman "screaming for her life," so she went to her balcony from where she saw LaChance in the parking lot hitting Lane's head and shoulders while Lane "coward (sic) down" to "deflect his blows," which Ritter described as "extremely forceful." (ECF No. 19-7 at 21-24.) Ritter said she was "scared," because she "saw in [LaChance's] eyes that at that moment, he wanted to kill her," but her fear did not compare "to the fear [she] saw in [Lane's] eyes that day." (*Id.* at 31.)

Lane and Ritter each testified that when Ritter yelled that she was calling the police, LaChance released Lane and ran back toward the apartment while Lane ran in the opposite direction. (ECF Nos. 19-5 at 44; 19-7 at 24, 29.) Ritter called 911 while Lane hid. (ECF Nos. 19-5 at 44; 19-7 at 29.) Lane, recognizing the sound of her car's dual-exhaust engine, believed LaChance took her car keys and left in her car, so she returned to her apartment where neighbors told her they called police. (ECF No. 19-5 at 44-45, 116.)

Officer Carl Flowers of Sparks Police Department testified he found Lane "very upset, very hurting," and "crying." (ECF No. 19-7 at 46.) Lane told Flowers that LaChance strangled her by holding her down on the bed "with one hand around her throat" and hitting her with his other hand on her face and ear so hard "she saw stars," and became dizzy and nauseous. (*Id.* at 46.) Lane further told Flowers that LaChance "cut her airway off causing her to almost pass out." (*Id.* at 46–47.) Flowers said he saw "deep bruises, marks," on Lane's ear and bruises on her face "all down her legs, all over her body, front and back." (*Id.* at 47.) Flowers took photographs of Lane's injuries at the hospital, which were admitted into evidence. (ECF Nos. 19-5 at 7; 19-6 at 2; 19-7 at 49.) Flowers stated

he heard the doctor mention there was blood in Lane's eardrum, and Flowers noticed Lane was given ice. (ECF No. 19-7 at 50-51.) He looked for handprints on Lane's upper neck, near her carotid artery and jaw, but found only light marks on her neck. (*Id.* at 51-52, 56.)

Lane testified LaChance's aunt and uncle drove her to the hospital where she spent the rest of the day in treatment for an ear hemorrhage, contusions (arm, back, buttocks, ear, face, feet, hand, hip, knee, leg, neck, shins, shoulder, tailbone), and a forehead laceration. (ECF No. 19-5 at 46-47, 99-107.) According to Lane, her ear was black and purple, and the injury to her shin swelled up like a baseball. (*Id.* at 51-52.) Lane first saw a nurse to whom she described her pain as a "seven" on a scale of "one to ten." (*Id.* at 98.) She agreed that medical records reflected she complained of "airway, breathing, circulation and neuro," and "neck and back" tenderness, but omitted "choking." (*Id.* at 100, 102.) Lane also agreed her reported pain was "moderate" by the time the emergency room physician saw her. (*Id.* at 103-05.) She said X-rays revealed nothing broken. (*Id.* at 105–07.) The doctor prescribed Percocet for pain, an antibiotic (amoxicillin) for her ear, and ibuprofen for swelling. (*Id.* at 46, 108.) Lane agreed the doctor directed her to rest, apply ice to her ear, and to "expect an increase in pain for two days . . . before gradual improvement," and to take the antibiotics if pain persisted. (*Id.* at 107.)

After she left the hospital, Lane said she stayed with LaChance's aunt and uncle "for a few days" on bedrest because her shins and tailbone were bruised and swollen, and she was unable to wear shoes due to her swollen feet. (*Id.* at 48-49, 52-53, 121.) Lane stated her injuries were painful for "a good few months." (*Id.* at 48-49.) She claimed immediate hearing loss that improved but was "still not the same" by trial. (*Id.* at 47.) She explained her hearing went "in and out," and she suffered a "muscle thing" that caused "pain in there" during vigorous workouts and similar activity. (*Id.* at 48-49.) She could no longer sit for long periods due to the tailbone injury and could "no longer run" due to the damage to her shins, which she described as "shin splints." (ECF Nos. 19-5 at 48, 120; 19-7 at 17.) Lane did not seek medical assistance after the hospital visit because she was

uninsured. (ECF No. 19-5 at 48, 108.) She explained she did not have a medical diagnosis for shin splits; but the emergency room doctor told her she "would probably have prolonged injuries" and the healing process causes "calcium deposits," which are likely to cause shin splits because she is a runner. (ECF No. 19-7 at 16-17.)

Lane testified LaChance intimidated her with text and phone messages demanding she recant her story to police. (ECF No. 19-5 at 56.) LaChance told her "[y]ou're going to make this go away," during a phone conversation a few days after the incident. (*Id.* at 56-57.) Lane felt threatened and worried because she "didn't want to be any part of any of this if it meant something bad was going to happen" to her, so she told police she did not wish to press charges. (*Id.* at 59.) She told police that LaChance "didn't choke" her or keep her against her will because LaChance told her to recant her story. (*Id.* at 60.) Lane agreed LaChance did not "choke" or "strangle" her with "two hands," and she agreed the medical records did not indicate she was "choked." However, she maintained LaChance's actions impeded her breathing, and her air was cut off when LaChance, while sitting on top of her, pressed on the bottom of her neck and top of her chest. (ECF Nos. 19-5 at 100, 104; 19-7 at 13-15.)

Lane further testified that about a week after the incident, on March 19, 2012, she checked into a Reno Motel 6 with LaChance for two nights because she still "had love for" LaChance and felt she still "was in a relationship with" him. (ECF Nos. 19-5 at 58, 60; 19-7 at 7.) On the morning of March 21, 2012, Lane stepped out of the motel room for a cigarette, and encountered police, who while searching for LaChance, spotted Lane's car and surrounded the motel. (ECF No. 19-5 at 62-63; *see also* ECF No. 19-7 at 70-73.)

Detective Curtis English of Sparks Police Department testified that Lane was cooperative with police until March 19, 2012, and she did not "tip" police to LaChance's location at the motel. (ECF No. 19-7 at 68, 71-73.) Lane testified that police kept her "outside in the car" while they convinced LaChance to surrender from inside the motel room. (ECF No. 19-5 at 63.) English said LaChance did not surrender until approximately 10 minutes after the police first asked him to do so. (ECF No. 19-7 at 73-75.)

1   Lane consented to a search of the motel room and told police that two duffel bags

2   inside the room, a black one and a red one, belonged to LaChance. (ECF Nos. 19-5 at

3   60-61, 64; 19-7 at 78.) Police found marijuana leaves floating inside the motel toilet and

4   Zip-Loc baggies of marijuana inside the toilet tank. (ECF No. 19-7 at 79-80, 134.) Police

5   searched Lane's belongings and found $1,585 in cash inside her makeup bag. (ECF Nos.

6   19-5 at 67-68; 19-7 at 78.) Lane expressed genuine surprise, according to English, to

7   seeing the money and told police it did not belong to her. (ECF No. 19-7 at 78-79.) Lane

8   testified that the boyfriend of LaChance's mother, Maury, later told Lane that "[LaChance]

9   needs the money put in your makeup bag so we can post bail." (ECF No. 19-5 at 68.)

10   Police obtained a warrant to search the duffel bags after a police canine alerted to

11   the presence of narcotics. (ECF No. 19-7 at 81-82.) English testified that police found no

12   "women's items" in those duffel bags. (*Id.* at 118.) The black duffel bag contained, *inter*

13   *alia*, LaChance's prescription medication, a black digital scale (which could be used to

14   weigh marijuana), and Yves St. Laurent cologne. (*Id.* at 82-88, 96) The red duffel bag

15   contained, *inter alia*, a man's belt, Yves St. Laurent cologne, scales, a box for the black

16   digital scale found in the black duffel bag, and five baggies and a jar containing a total of

17   about 4.6 gross pounds of marijuana. (*Id.* at 82-88, 90-96.)

18   Following his convictions and adjudication as a habitual criminal, LaChance was

19   sentenced to, *inter alia*, life imprisonment with eligibility for consideration for parole after

20   10 years. (ECF No. 20-39.) LaChance challenged the judgment of conviction on both

21   direct appeal and state postconviction review. (ECF Nos. 20-21; 21-24; 22-19; 22-21.)

22   **III.   GOVERNING STANDARD**

23   28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in

24   habeas corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

25   An application for a writ of habeas corpus on behalf of a
person in custody pursuant to the judgment of a State court
26   shall not be granted with respect to any claim that was
adjudicated on the merits in State court proceedings unless
27   the adjudication of the claim —

28   (a) resulted in a decision that was contrary to, or involved an
unreasonable application of, clearly established Federal

7

1        law, as determined by the Supreme Court of the United
         States; or

2    (b) resulted in a decision that was based on an unreasonable
         determination of the facts in light of the evidence
3        presented in the State court proceeding.

4    28 U.S.C. § 2254(d).

5        A state court's decision is contrary to clearly established United States Supreme

6    Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule

7    that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state

8    court confronts a set of facts that are materially indistinguishable from a decision of [the

9    Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*,

10   529 U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state

11   court's decision is an unreasonable application of clearly established Supreme Court

12   precedent within the meaning of 28 U.S.C. § 2254(d), "if the state court identifies the

13   correct governing legal principle from [the Supreme] Court's decisions but unreasonably

14   applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529

15   U.S. at 413). "The 'unreasonable application' clause requires the state court decision to

16   be more than incorrect or erroneous . . . [rather] [t]he state court's application of clearly

17   established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at

18   409-12) (internal citation omitted).

19       The Supreme Court has held, "[a] state court's determination that a claim lacks

20   merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

21   correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011)

22   (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated

23   "that even a strong case for relief does not mean the state court's contrary conclusion

24   was unreasonable." *Id.* at 102  (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v.*

25   *Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult-to-meet" and

26   "highly deferential standard for evaluating state-court rulings, which demands state-court

27   decisions be given the benefit of the doubt." (internal quotation marks and citations

28   omitted)).

The AEDPA's deferential standard of review "is demanding but not insatiable." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005). "Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review[; and] [d]eference does not by definition preclude relief." *Miller-El v. Cockrell*, 527 U.S. 322, 340 (2003). Although the AEDPA standard requires federal courts "to give considerable deference to the state courts, AEDPA deference is not a rubber stamp." *Anderson v. Terhune*, 516 F.3d 781, 786 (9th Cir. 2008) (citing *Miller-El*, 545 U.S. at 240).

## IV.    DISCUSSION

### A.    Ground I

In Ground I, LaChance alleges his right to effective assistance of counsel was violated because his counsel did not request jury instructions on misdemeanor domestic battery as a lesser included offense for felony (a) domestic battery by strangulation, or (b) domestic battery causing substantial bodily harm. (ECF No. 1 at 10-15.)

#### 1.    Ineffective Assistance of Counsel

*Strickland* announced a two-prong test for ineffective assistance of counsel claims, which requires a petitioner demonstrate (1) the attorney's "representation fell below an objective standard of reasonableness[;]" and (2) the attorney's deficient performance prejudiced petitioner such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Courts considering an ineffective-assistance-of-counsel claim, "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . ." *Id.* at 689 (citation omitted). A petitioner must show "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Id.* at 687.

Under *Strickland*, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691.

"[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91.

Establishing a state-court-decision on an ineffective-assistance-of-counsel claim is unreasonable under the AEDPA is especially difficult where the state court adjudicated the claim under *Strickland. See Harrington*, 562 U.S at 104-05. In *Harrington*, the Supreme Court clarified that *Strickland* and § 2254(d) are each highly deferential to counsel's conduct, and when the two apply in tandem, review is doubly deferential. *See id.* at 105 (citation omitted); *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (internal quotation marks omitted) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland's* deferential standards apply; hence, the Supreme Court's description of the standard as doubly deferential.").

## 2.    Additional Background

Defense counsel Suzanne Lugaski testified at the state postconviction evidentiary hearing as follows:

> Q: Okay. Why didn't you submit a jury instruction for a lesser included of misdemeanor battery?
>
> A: Because I didn't think I would need that. Because of the fact that if he was going to get convicted, he was going to get convicted on the felony. That there was substantial evidence to possibly get him convicted of that.

(ECF No. 21-14 at 70-71.) Lugaski also admitted she "didn't think of" submitting a lesser-included jury instruction, "[b]ecause if the jury was going to find [LaChance] guilty, they would have ignored" counsel's arguments that the evidence did not support substantial bodily harm. (*Id.* at 71.) When asked whether the jury could have found LaChance guilty

of the lesser-included misdemeanor battery, Lugaski responded, "[p]ossibly," "[p]ossibly not," and "[a]nything is possible." (*Id.* at 71-72.)

### 3.    The State Court's Determination

The Nevada Court of Appeals rejected the corresponding claims as follows:

> Appellant Darren Gabriel LaChance argues the district court erred in denying his claims of ineffective assistance of counsel raised in his June 19, 2004 petition. To prove ineffective assistance of counsel, a petitioner must demonstrate that counsel's performance was deficient in that it fell below an objective standard of reasonableness, and resulting prejudice such that there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984); *Warden v. Lyons*, 100 Nev. 430, 432-33, 683 P.2d 504, 505 (1984) (adopting the test in *Strickland*). Both components of the inquiry must be shown, *Strickland*, 466 U.S. at 697, and the petitioner must demonstrate the underlying facts by a preponderance of the evidence, *Means v. State*, 120 Nev. 1001, 1012, 103 P.3d 25, 33 (2004). We give deference to the district court's factual findings if supported by substantial evidence and not clearly erroneous but review the court's application of the law to the facts de novo. *Lader v. Warden*, 121 Nev. 682, 686, 120 P.3d 1164, 1166 (2005).

> Appellant Darren Gabriel LaChance argues the district court erred in denying his claims of ineffective assistance of counsel raised in his June 19, 2004 petition. To prove ineffective assistance of counsel, a petitioner must demonstrate that counsel's performance was deficient in that it fell below an objective standard of reasonableness, and resulting prejudice such that there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984); *Warden v. Lyons*, 100 Nev. 430, 432-33, 683 P.2d 504, 505 (1984) (adopting the test in *Strickland*). Both components of the inquiry must be shown, *Strickland*, 466 U.S. at 697, and the petitioner must demonstrate the underlying facts by a preponderance of the evidence, *Means v. State*, 120 Nev. 1001, 1012, 103 P.3d 25, 33 (2004). We give deference to the district court's factual findings if supported by substantial evidence and not clearly erroneous but review the court's application of the law to the facts de novo. *Lader v. Warden*, 121 Nev. 682, 686, 120 P.3d 1164, 1166 (2005).

> . . . LaChance argues his trial counsel was ineffective for failing to request a jury instruction on misdemeanor battery constituting domestic violence as a lesser-included offense for the charges of battery by strangulation constituting domestic violence and battery constituting domestic violence causing

substantial bodily harm. LaChance failed to demonstrate he was prejudiced. Given the jury's verdict, the jury necessarily found beyond a reasonable doubt LaChance strangled the victim and caused her to sustain substantial bodily harm. Further, our review of the record reveals substantial evidence to support these findings. Under these circumstances, LaChance failed to demonstrate a reasonable probability jury would have convicted him of misdemeanor battery constituting domestic violence, rather than the greater offenses, had his trial counsel sought and the jury been instructed on such lesser-included-offense instructions. *See Harrington v. Richter*, 112 U.S. 86, 112 (2011) (explaining that under the *Strickland* prejudice standard, "[t]he likelihood of a different result must be substantial, not just conceivable."); *Crace v. Herzog*, 798 F.3d 840, 851 (9th Cir. 2015). Therefore, we conclude the district court did not err in denying this claim.

(ECF No. 22–21 at 2–3.)

### 4.    State Court Unreasonably Applied *Strickland*

"[I]n ineffective assistance cases involving a failure to request a lesser-included-offense instruction, *Strickland* requires a reviewing court to assess the likelihood defendant's jury would have convicted only on the lesser included offense." *Crace v. Herzog*, 798 F.3d 840, 849 (9th Cir. 2015) (citing *Keeble v. United States*, 412 U.S. 205, 213 (1973) (quotation omitted)). "Only by performing that assessment can a court answer the question expressly posed by *Strickland*: whether there is a reasonable probability that, if the defendant's lawyer had performed adequately, the outcome of the proceeding would have been different." *Id.* (citing *Strickland*, 466 U.S. at 694). This requires a court to "weigh all the evidence of record . . . to determine whether there was a reasonable probability that the jury would have convicted [the defendant] only of [the lesser offense] if it had been given the option." *Id.* (citing *Breakiron v. Horn*, 642 F.3d 126, 140 (3d Cir. 2011)).

As in *Crace*, the state court here did not meet its obligation under *Strickland*'s prejudice prong to analyze whether there was a reasonable probability evidence would have permitted the jury to convict only on the lesser included offense, had it been given the option. A determination based on a jury's convictions and substantial evidence

///

///

1  supporting convictions for greater offenses is an inadequate substitute for the reasonable

2  probability analysis under *Strickland.*[5] *See e.g., Crace*, 798 F.3d at 849.

3  The Court applies *de novo* review to LaChance's claim that counsel was ineffective

4  in failing to request the lesser-included-offense instruction because the state appellate

5  court unreasonably applied *Strickland's* prejudice prong by failing to examine whether, on

6  record evidence, there was a reasonable probability the jury would have instead convicted

7  LaChance of the lesser included offense, had it been given the option.

8  ## 5.  Nevada State Law

9  A jury will be instructed on a lesser included offense upon request "if there is any

10  evidence at all, however slight, on any reasonable theory of the case under which the

11  defendant might be convicted of a . . . lesser included offense." *Lisby v. State*, 414 P.2d

12  592, 595 (Nev. 1966) (citations omitted). "[A] state court must focus on whether credible

13  evidence admitted at trial warranted a lesser included offense, not whether the evidence

14  was sufficient to prove the greater one." *Rosas v. State*, 147 P.3d 1101, 1106 n.10 (Nev.

15  2006) (*citing Hooks v. Ward*, 184 F.3d 1206, 1232 (10th Cir. 1999) (emphasis omitted)),

16  *abrogated on other grounds by Alotaibi v. State*, 404 P.3d 761 (Nev. 2017).

17  At the time of the offenses, "battery" meant "any willful and unlawful use of force

18  or violence upon the person of another." NRS § 200.481(1)(a), as amended by 2009

19  Laws, ch. 42, § 3. Misdemeanor battery was distinguished from felony battery as follows:

20  Except as otherwise provided in NRS 200.485, a person
21  convicted of a battery, other than a battery committed by an
   adult upon a child which constitutes child abuse, shall be
22  punished:

23  (a) If the battery is not committed with a deadly weapon, and
      no substantial bodily harm to the victim results, except

24

25  _____
   [5]The State contends that the state appellate court decision is entitled to the AEDPA
26  deference because it cited *Strickland* and *Crace* and found "substantial" evidence
   supported the verdict for the greater offense, whereas the state court in *Crace* applied
27  a sufficiency of the evidence test. (ECF No 36 at 8-9.) This point does not redeem the state
   appellate decision here as it nonetheless failed to undertake any analysis to determine
28  the likelihood, considering all the evidence, that LaChance's jury would have convicted
   only on the lesser included offense had an instruction permitted it to do so. Consequently,
   the state appellate court unreasonably applied *Strickland's* prejudice prong to the facts.

under circumstances where a greater penalty is provided in this section or NRS 197.090, for a misdemeanor.

(b) If the battery is not committed with a deadly weapon, and either substantial bodily harm to the victim results or the battery is committed by strangulation, for a category C felony as provided in NRS 193. 130.

NRS § 200.481(2), as amended by 2009 Laws, ch. 42, § 3.

"Strangulation" was defined as "intentionally impeding the normal breathing or circulation of the blood by applying pressure on the throat or neck or by blocking the nose or mouth of another person in a manner that creates a risk of death or substantial bodily harm." *See* NRS § 200.481(1)(h), as amended by 2009 Laws, ch. 42, § 3.

According to NRS § 0.060, "[u]nless the context otherwise requires," "substantial bodily harm" means:

(1) Bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ; or

(2) Prolonged physical pain.

According to the Nevada Supreme Court, "the phrase 'prolonged physical pain' must necessarily encompass some physical suffering or injury that lasts longer than the pain immediately resulting from the wrongful act." *Collins v. State*, 203 P.2d 90, 92-93 (2009). As the *Collins* court explained: "In a battery, for example, the wrongdoer would not be liable for 'prolonged physical pain' for the touching itself . . . [but] the wrongdoer would be liable for any lasting physical pain resulting from the touching." *Id.* at 64-65, n.3.

### 6.    Ground I(a)[6]

This Court analyzes both *Strickland* prongs for the challenge to counsel's failure to request a lesser-included-offense instruction for domestic battery by strangulation because the Court finds prejudice under *Strickland* on *de novo* review.

---

[6]The Court has subdivided Ground I into Ground I(a) challenging the conviction for domestic battery by strangulation and Ground I(b) challenging the conviction for domestic battery causing substantial bodily harm.

14

### a.   *Strickland* **Performance Prong**

The Court analyzes the *Strickland* performance prong *de novo* because the state appellate court did not address it in its denial of relief. *See Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (holding where a state court denied relief based on one element of the *Strickland* claim and, therefore, did not reach the other, a federal court applies *de novo* review to the *Strickland* element on which the state court did not rule (citing *Wiggins v. Smith*, 539 U.S. 510, 534 (2003)).

As later discussed below in the analysis of *Strickland's* prejudice prong, there was at least slight evidence upon which the jury could have convicted LaChance of the lesser offense of misdemeanor domestic battery instead of the greater offense of domestic battery by strangulation, such that the state district court would have provided an instruction on the lesser offense had counsel requested it. *See infra* at 16-17.

Although *Strickland* instructs that deference is owed to counsel's actions when they are the result of an informed strategic decision, the state court record reflects counsel's failure was neither strategic nor deliberate, and instead counsel did not consider requesting a lesser-included-offense instruction:

> Q: Okay. Why didn't you submit a jury instruction for a lesser included of misdemeanor battery?
>
> A: Because I didn't think I would need that. Because of the fact that if he was going to get convicted, he was going to get convicted on the felony. That there was substantial evidence to possibly get him convicted of that.

(ECF No. 21-14 at 70-71.) Given the strong evidence a battery occurred, the state court record demonstrates a lesser-included-offense instruction would no way undermined defense counsel's arguments that the State failed to prove strangulation, and nothing suggests counsel deliberately and reasonably rejected the path of a lesser-included-offense instruction to pursue an all-or-nothing strategy.[7] Moreover, contrary to counsel's testimonial assumption, the jury appears to have discussed whether the State proved

---

[7]In *Crace*, the Ninth Circuit noted the reasonableness of a strategic decision to forgo a lesser-included-offense instruction to force the jury into an "all-or-nothing" decision is appropriately examined under *Strickland's* performance prong. 798 F.3d at 849, n.4.

1    Lane was strangled as evidenced by the jury's note in which it started to ask the court for

2    a "definition of strangulation," but crossed it out. (ECF No. 19-10 at 3.)

3        Based on evidentiary record, this Court holds on *de novo* review that counsel's

4    performance was deficient under *Strickland* because failure to request an instruction of

5    misdemeanor domestic battery, as a lesser included offense for felony domestic battery

6    by strangulation, fell below an objective standard of reasonableness.

7                            **b.    *Strickland* Prejudice Prong**

8        This Court reviews the *Strickland* prejudice prong *de novo* because the state

9    appellate court's analysis was objectively unreasonable. *See supra* at 12-13.

10        For the charge of domestic battery by strangulation, the State alleged LaChance

11   "applied pressure on the victim's throat and/or neck, intentionally impeding the normal

12   breathing or circulation of the blood in a manner that created a risk of death or substantial

13   bodily harm." (ECF Nos. 18-5 at 2; 19-5 at 5-6; 19-11 at 5.)

14        Defense counsel argued the State failed to prove the alleged actions amounted to

15   strangulation. (ECF No. 19-8 at 34-35, 38; *see also* 24-26, 54, 56.) While Lane agreed

16   LaChance did not strangle or choke her (according to her own definition), she maintained

17   LaChance's actions impeded her breathing because her air was cut off at the bottom of

18   her neck and top of her chest when LaChance sat on her with his knee in her chest and

19   his entire weight on her, while pressing on the bottom of her neck or collarbone with his

20   hand as her head hung off the bed. *See supra* at 3, 6. Lane's written statement to police

21   and to Flowers indicated LaChance grabbed her by the "neck." *See supra* at 3, 4.

22   However, when Flowers looked for handprints on Lane's neck, Flowers said he only found

23   "light marks." *See supra* at 4-5.

24        Based on evidentiary record, the jury could have reasonably concluded the actions

25   alleged for the offense constituted a domestic battery but did not include strangulation.

26   Accordingly, there is a reasonable probability the jury would have convicted LaChance of

27   misdemeanor domestic battery, under NRS § 200.481(2), instead of felony domestic

28   battery by strangulation, had the jury been given the option to do so. *See Keeble*, 412

U.S. at 208 (stating that "it is now beyond dispute that the defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater.").

The Court finds on *de novo* review that LaChance was denied effective assistance of counsel regarding the conviction for domestic battery by strangulation. LaChance is granted relief for Ground I(a) of the Petition, as specified further *infra*.

### 7.    Ground I(b)[8]

The Court analyzes only the *Strickland* prejudice prong for LaChance's Ground I(b) challenge to his conviction for domestic battery causing substantial bodily harm. In contrast to the discussion regarding the conviction for domestic battery by strangulation, there is no reasonable probability, on the state court record, that the jury would have convicted LaChance of misdemeanor domestic battery in lieu of the greater offense of felony domestic battery causing substantial bodily harm.

The jury asked for the definition of prolonged physical pain, by asking: "3 hours? 3 days? 3 months? 3 years?" (ECF No. 19-10 at 4.) The state district court replied with the definition from *Collins*, 203 P.3d at 92-93: "'Prolonged physical pain' must necessarily encompass some physical suffering or injury that last longer than the pain immediately resulting from the wrongful act." (*Id* at. 5; ECF No. 19-8 at 81.)

The jury was presented with Lane's testimony that she was at the hospital for several hours for treatment for her injuries. The doctors performed x-rays out of concern that Lane could have broken bones and the emergency room physician told her she could "expect an increase in pain for two days . . . before gradual improvement." *See supra* at 5. Lane also testified her ear hemorrhage caused immediate hearing loss and hearing impairment that lasted a few weeks and was not yet normal at trial. She was on bedrest for a few days and unable to wear shoes for "awhile." She said her pain lasted "a good few months," and by the time of trial, she was still unable to sit for extended periods due to her tailbone injury and could not run due to her shin injuries. *See supra* at 5-6. Flowers

---

[8]*See supra* note 6.

1    also testified he saw "deep bruises," on Lane's ear and "all over her body, front and back"

2    and he took photographs at the emergency room. *See supra* at 4.

3    This Court finds on *de novo* review, based on evidentiary record and the

4    "prolonged physical pain" definition under Nevada law, there was no reasonable

5    probability the jury would have convicted LaChance of the lesser crime of misdemeanor

6    domestic battery in lieu of domestic battery causing substantial bodily harm, had it been

7    instructed it could do so. As such, LaChance was not prejudiced by counsel's failure to

8    request the lesser-included-offense instruction as alleged in Ground I(b).

9                    **8.    Disposition of Ground I**

10   Ground I is granted in part and denied in part. Relief is granted on Ground I(a) for

11   the conviction for domestic battery by strangulation and the conviction will be vacated

12   subject to the State's ability to potentially retry LaChance for that offense within a certain

13   time, as specified in the conclusion of this order. Relief is denied on Ground I(b) as to the

14   conviction for domestic battery causing substantial bodily harm.

15            **B.    Ground II**

16   In Ground II, LaChance alleges his right to effective assistance of counsel was

17   violated when counsel failed "to investigate and bring out the victim's" Facebook

18   messages, as inconsistent with Lane's trial testimony and the charges, and reflecting her

19   motive to lie. (ECF No. 1 at 15-20.)

20                    **1.    Additional Background**

21                          **a.    Trial**

22   Before defense counsel Lugaski commenced cross-examining Lane on the first

23   day of trial testimony, Lugaski informed the court she gave transcribed copies of

24   purported Facebook messages between Lane and LaChance's ex-girlfriend Melia Shively

25   to the State attorney.[9] (ECF No. 19-5 at 70-72.) Lugaski expressed concerned about the

26

27            [9]Respondents did not object to LaChance's submission of what appears to be a
28   portion of the Facebook messages admitted into evidence at the postconviction
     evidentiary hearing and attached to LaChance's reply to Respondents' answer to the
     Petition. (ECF No. 40 at 27-30; *see also* ECF No. 21-15 at 3.)

authenticity of the messages and acknowledged disclosure was tardy. (*Id*. at 74-75.) She explained Lane's purported messages included "statements about some of the evidence in this case," and included statements that contradicted Lane's written statement, but also included "so-called prior bad acts" on the part of LaChance. (*Id*. at 71, 75.) Lugaski said she would like to use "some" of the messages, but she could "do the same thing from the preliminary hearing transcript" as she planned to impeach Lane with prior testimony if she testified that LaChance had strangled her. (*Id*. at 75-76.)

The State argued the typed messages were not authenticated and contained references to "a prior bad act" the State did not rely upon "where Star[leen Lane] was abused by the defendant." (*Id*. at 72, 74.) The State conceded, however, that Lane's messages contained an admission that LaChance did not strangle her. (*Id*. at 73.)

The state district court ruled the messages inadmissible for lack of authentication under NRS § 52.015. (*Id*. at 76-77.)

### b.   Postconviction Evidentiary Hearing

At the postconviction evidentiary hearing, Shively testified she knew LaChance for 17 years and became acquainted with Lane while responding to a post on C.J.'s Facebook page. (ECF No. 21-14 at 32-33, 36.) Shively identified Exhibit 1, which was admitted into evidence, as messages between her and Lane, beginning about a month before Lane's message to Shively on the day of the incident. (*Id*. at 33-35.)

Lugaski testified she would have used the Facebook statements "if Star[leen] Lane had been making up the statements in there . . ." but Lugaski did not see that as the case. (*Id*. at 48.) Lugaski said Shively told her Lane's messages stated untruths, but Lugaski said she "didn't see that . . . [and] [i]f it was there, she didn't print it out." (*Id*. at 48-49.) Lugaski agreed Lane messaged that LaChance did not strangle her but explained that Lane admitted this during her preliminary hearing testimony, and Lane testified at trial that "[LaChance] never put his hands on her throat." (*Id*. at 50.) Lugaski testified she believed the messages were consistent with Lane's testimony and Lugaski was otherwise ///

1  concerned about references in the messages to LaChance's alleged prior bad actions

2  toward Lane. (*Id.* at 62.)

3            **2.**        **State Court's Determination**

4        The Nevada Court of Appeals rejected the corresponding claim as follows:

5        . . . LaChance argues his trial counsel was ineffective
6  for failing to investigate and discover inconsistent statements
   the victim made on Facebook regarding the incidents at issue
7  in this matter. During trial, counsel advised the court she had
   recently received documents from LaChance's mother which
8  purportedly contained retyped statements made by the victim
   on Facebook regarding the incidents at issue. The district
9  court conducted a hearing regarding the documents and
   concluded they were inadmissible because they could not be
10 authenticated as statements made by the victim. *See* NRS
   52.015(1). LaChance argues counsel should have performed
11 actions to discover these statements at an earlier time and
   therefore could have been prepared to properly present them
12 at trial. Petitioner failed to demonstrate his counsel's
   performance was deficient or resulting prejudice.

13       At the evidentiary hearing, counsel testified she first
14 learned of the actual Facebook statements during trial. The
   district court concluded counsel was credible and substantial
15 evidence supports this conclusion. LaChance fails to
   demonstrate objectively reasonable counsel could have
16 undertaken further investigation given these circumstances.
   *See Strickland*, 466 U.S. at 691 (explaining that a decision not
17 to investigate must be assessed for reasonableness
   considering the circumstances in which the decision was
18 made and "[c]ounsel's actions are usually based, quite
   properly . . . on information supplied by the defendant.").

19       The district court further concluded the Facebook
20 statements were mostly consistent with the victim's trial
   testimony and also contained "damning evidence" of
21 additional improper conduct committed by LaChance.
   Substantial evidence supports the district court's conclusions.
22 Given the nature of the Facebook statements, LaChance did
   not demonstrate a reasonable probability of a different
23 outcome had counsel investigated and presented those
   statements at trial. Therefore, the district court did not err in
24 denying this claim.

25 (ECF No. 22-21 at 3-4.)

26           **3.**        **Deferential Analysis of *Strickland* Prejudice Prong**

27       The state appellate court's determination is neither contrary to nor an

28 unreasonable application of United States Supreme Court authority, and is not based on

an unreasonable determination of the facts. This Court reaches only the *Strickland* prejudice prong for LaChance's challenge to counsel's failure to investigate and present the Facebook messages alleged in Ground II.

LaChance raises various reasons why he contends he was prejudiced by counsel's failure to investigate and present Lane's Facebook messages. (ECF No. 1 at 15-19.) The Court will not address Ground II as it relates to the conviction for domestic battery by strangulation because, as stated above, the Court will grant relief for that conviction on Ground I(a).

LaChance asserts his counsel's failure to present the message in which Lane told Shively that LaChance did not lock her in the bathroom was prejudicial. (ECF No. 1 at 16.) There is no prejudice because the false imprisonment conviction was based not upon LaChance locking Lane in the bathroom but instead on his refusal to let her leave the bedroom. (ECF No. 19-8 at 11-12, 70-71.)

LaChance claims he was prejudiced by his counsel's failure to show that Lane's messages to Shively omitted an inability to hear, pain in her legs, or shin splints. (ECF No. 1 at 16.) Lane's messages, although not comprehensive, were consistent with her trial testimony about her injuries. (ECF No. 40 at 27.) In a message to Shively about a week after the incident, Lane stated:

> He slapped me so hard so many times that my ears were bleeding. He kicked me a few times. He hit me with a flashlight on my head, knee, and wrist. Socked me up. Threatened to kill me. Got on top of me at one point with his knee in my chest and grabbed my neck and was shaking me threatening to break my foot and wrist.

(ECF Nos. 19-5 at 95-6; 40 at 27.) Lane's messages did not contradict her testimony that she suffered hearing loss, shin splints, or leg pain. *See supra* at 2-6. As such, there is no reasonable probability that presenting Lane's omission of some of her injuries in her messages to Shively would have resulted in a different outcome.

LaChance asserts his counsel's failure to present the Facebook messages prejudiced him because the messages demonstrate Lane was motivated to lie or

1  exaggerate due to her anger because she believed LaChance was unfaithful. (ECF No.
2  1 at 16-17.) However, Lane's angry belief that LaChance was unfaithful could have made
3  Lane a more sympathetic witness, particularly in the context of her message to Shively:
4  "I told myself after the last physical confrontation that i (sic) was done . . . ." (ECF No. 40
5  at 27.)

6         Even if the Facebook messages demonstrated Lane harbored a motive to lie or
7  exaggerate her injuries, there is no reasonable probability that the presentation of Lane's
8  messages would have resulted in a different outcome because other evidence strongly
9  corroborated Lane's testimony about the nature of her injuries and her prolonged physical
10  pain. The neighbor, Ritter, testified she heard Lane "screaming for her life" and saw
11  LaChance hit Lane's head and shoulders with extreme force while Lane "coward (sic)
12  down" to "deflect his blows." *See supra* at 4. Flowers also testified that he took photos of
13  Lane's injuries at the hospital, and saw "deep bruises," on Lane's ear and bruises and
14  marks "all over her body, front and back." *See supra* at 4. Flowers heard the emergency
15  room physician mention blood in Lane's ear and saw Lane was given ice. *Id.* The
16  prolonged nature of the injuries was demonstrated by the emergency room physician's
17  prescription for pain medication and statement telling Lane to "expect an increase in pain
18  for two days . . . before gradual improvement." *See supra* at 5.

19         LaChance contends he was prejudiced because his counsel could have used the
20  Facebook messages to argue to the jury that Lane's anger over his alleged infidelity gave
21  her motive to lure him to the motel to reconcile for two days so she could plant the
22  marijuana the police found in his duffel bag. There is no reasonable probability using the
23  messages for such an argument would have changed the outcome on the marijuana
24  conviction. Such an argument reasonably could not have undermined the strength of the
25  evidence of LaChance's possession of marijuana found by police. Detective English
26  testified that Lane did not tip police to LaChance's location at the motel and Lane testified
27  police kept her outside in the car while LaChance was alone inside the motel room for at
28  least 10 minutes after police asked him to surrender. *See supra* at 6. Police found

marijuana in the toilet bowl and toilet tank. *Id.* Police also testified they found marijuana along with prescription medication, scales, and male clothing and cologne, but no "women's items," inside the duffel bags attributed to LaChance. *See supra* at 7. These circumstances supported a strong inference, *inter alia*, that LaChance was aware of and at least initially tried to dispose marijuana that knowingly was in his possession, while he tried to stall police. Moreover, there otherwise was nothing in the Facebook messages themselves about marijuana, marijuana in the room, or planting marijuana to retaliate against LaChance.

LaChance claims he was prejudiced by his counsel's failure to introduce Lane's messages admitting the beating was precipitated by her affair with C.J. (ECF No. 1 at 16.) There was no reasonable probability of a different outcome because the state court excluded evidence about the cause of the incident and would not have permitted presentation of related messages. (ECF Nos. 18-12; 18-13; 19-5 at 13-15; 19-6 at 2.)

Based on evidentiary record, there is no reasonable probability the presentation of the messages would have resulted in different outcome. The state court's application of *Strickland's* prejudice prong to LaChance's claim was objectively reasonable and LaChance is not entitled to federal habeas relief on Ground II.

### C.    Grounds III and IV

In Grounds III and IV, LaChance alleges there was insufficient evidence to establish his convictions for (a) domestic battery by strangulation, and (b) domestic battery causing substantial bodily harm. (ECF No. 1 at 20-25.)

### 1.    General Legal Principles

A jury's verdict must stand if, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979). A federal habeas petitioner faces a "considerable hurdle" when challenging the sufficiency of evidence to support his or her conviction. *Davis v. Woodford*, 384 F.3d 628, 639 (9th Cir. 2004). A reviewing court, faced with a record of historical facts that support conflicting

1    inferences, must presume the trier of fact resolved any conflicts in favor of the prosecution

2    and defer to that resolution, even if the resolution by the state court's trier of fact of specific

3    conflicts does not affirmatively appear in the record. *Id.* (citing *Jackson*, 443 U.S. at 326.)

4    The *Jackson* standard is applied with reference to substantive elements of the criminal

5    offense as defined by state law. *Id.* (citing *Jackson*, 443 U.S. at 324, n.16.) When the

6    deferential standards of the AEDPA and *Jackson* are applied together, the question for

7    decision on federal habeas review is whether the state court's decision unreasonably

8    applied the *Jackson* standard to the evidence at trial. *See e.g., Juan H. v. Allen*, 408 F.3d

9    1262, 1274-75 (9th Cir. 2005) (citations omitted).

10                          **2.      State Court's Determination**

11           The Nevada Supreme Court rejected the corresponding claims as follows:

12           *Sufficiency of the evidence*

13                   We first address LaChance's challenge to the
             sufficiency of the evidence to support the convictions for
14           domestic battery by strangulation and domestic battery
             causing substantial bodily harm. Under a challenge to the
15           sufficiency of the evidence, this court reviews the evidence in
             the light most favorable to the prosecution and determines
16           whether "any rational trier of fact could have found the
             essential elements of the crime beyond a reasonable doubt."
17           *Mitchell v. State*, 124 Nev. 807, 816, 192 P.3d 721, 727 (2008)
             (emphasis and internal quotation marks omitted). The jury is
18           tasked with assessing the weight of the evidence and the
             witnesses' credibility, *id.*; *Rose v. State*, 123 Nev. 194, 202-
19           03, 163 P.3d 408, 414 (2007), and may rely on both direct and
             circumstantial evidence in returning its verdict, *Wilkins v.
20           State*, 96 Nev. 367, 374, 609 P.2d 309, 313 (1980).

21           *Domestic battery by strangulation*

22                   LaChance contends that there was insufficient
             evidence of strangulation and therefore, he could not be
23           convicted of felony battery under NRS 200.485(2). He argues
             that the strangulation element was only supported by
24           speculation and ambiguous statements and that any difficulty
             in breathing resulted from Lane's anxiety.
25
                     NRS 200.485(1)(a) defines battery as "any willful and
26           unlawful use of force or violence upon the person of another."
             *See* also NRS 33.018 (defining acts of domestic violence).
27           When the battery is committed by strangulation, the
             perpetrator is guilty of a felony rather than a misdemeanor.
28           NRS 200.485(2). The Legislature defined strangulation as
             "intentionally impeding the normal breathing or circulation of

                                          24

the blood by applying pressure on the throat or neck or by blocking the nose or mouth of another person in a manner that creates a risk of death or substantial bodily harm." NRS 200.481(1)(h).

In reviewing the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found beyond a reasonable doubt that LaChance strangled Lane. The State presented evidence that LaChance placed his knee on Lane's chest and his hands on her clavicle/lower part of her neck and then put pressure on the area, impeding her breathing to the point that her vision was impaired. Depriving Lane of oxygen to the point where she lost vision supports a finding that LaChance applied pressure to Lane's throat or neck in a manner that created a risk of death or substantial bodily harm. Accordingly, we affirm the conviction for domestic battery by strangulation.

*Domestic battery causing substantial bodily harm*

LaChance also challenges the sufficiency of the evidence supporting the substantial-bodily-harm element of the domestic-battery-causing-substantial bodily harm conviction. He also contends that where the substantial bodily-harm element is based on prolonged pain, the pain must also be substantial, and here it was not.[FN1]

[FN1] LaChance also avers that the *Collins v. State*, 125 Nev. 60, 203 P.3d 90 (2009), definition of "prolonged physical pain" is inadequate and that this court should adopt the "prolonged . . . pain" standard elucidated in the dissent of *State v. King*, 827 N.E.2d 398, 402 (Ohio Ct. App. 2005) (Rocco, J., dissenting). Because LaChance's counsel acquiesced to the use of the definition found in *Collins* during trial, appellate consideration of this issue is limited to constitutional or plain error. *Saletta v. State*, 127 Nev. ___, ___, 254 P.3d 111, 114 (2011) (noting that failure to object during trial generally precludes appellate consideration of an issue); *Somee v. State*, 124 Nev. 434, 443, 187 P.3d 152, 159 (2008) ("[T]his court has the discretion to review constitutional or plain error."). Because there is no alleged constitutional component to this argument, the error here must be plain. "An error is plain if the error is so unmistakable that it reveals itself by a casual inspection of the record." *Saletta*, 127 Nev. at ___, 254 P.3d at 114 (internal quotation omitted). The error must also be clear under current Nevada law. *Id.* Accordingly, plain error cannot exist here because such a finding would be inconsistent with *Collins*, the controlling Nevada authority.

Where a battery results in substantial bodily harm, the battery becomes a felony. *See* NRS 200.485(2); NRS 200.481(2)(b). NRS 0.060 defines substantial bodily harm as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ; or . . . [p]rolonged physical pain." We have stated that "the phrase 'prolonged physical pain' must necessarily encompass some physical suffering or injury that lasts longer than the pain immediately resulting from the wrongful act." *Collins v. State*, 125 Nev. 60, 64, 203 P.3d 90, 92-93 (2009). "In a battery, for example, the wrongdoer would not be liable for 'prolonged physical pain' for the touching itself. However, the wrongdoer would be liable for any lasting physical pain resulting from the touching." *Id.* at 64 n.3, 203 P.3d at 93, n.3.

Reviewing the evidence in the light most favorable to the prosecution, we conclude that the State presented sufficient evidence to establish that Lane suffered prolonged physical pain. Lane was treated at the hospital for hemorrhaging of the ear and multiple contusion and welts. She testified that she was immobile for a few days afterward and that her injuries have resulted in permanent shin splints, which prevent her from running. The injuries to her tailbone hinder her ability to sit for long periods. She also has hearing loss as a result of the injuries suffered from the assault. We conclude that Lane's testimony and the medical records support a finding that Lane suffered "some physical suffering or injury that lasts longer than the pain immediately resulting from the wrongful act." *Collins*, 125 Nev. at 64, 203 P.3d at 92-93. Accordingly, LaChance's conviction for domestic battery causing substantial bodily harm is supported by sufficient evidence.

*LaChance v. State*, 321 P.3d 919, 924-26 (Nev. 2014).

### 3.    Analysis

#### a.    Ground III: Strangulation[10]

The state court's application of *Jackson* to the evidentiary record for the conviction for domestic battery by strangulation was objectively reasonable.

The elements of the crime of domestic battery by strangulation are discussed above. *See supra* at 13-14. The parties did not dispute Lane and LaChance were in a domestic relationship at the time of Lane's injuries and did not dispute LaChance battered Lane. *See supra* at 2-6. Although the parties disputed whether LaChance strangled Lane,

---

[10]This Court reaches Ground III notwithstanding the grant of relief on Ground I(a) because a grant of relief on Ground III would lead to an acquittal rather than instead a conditional writ grant subject to a possible retrial on the charge.

26

evidentiary record is sufficient for a rational jury to find the State met its burden to prove strangulation beyond a reasonable doubt.

In her written statement to police, Lane told police that LaChance "grabbed" her "throat and squeezed" it and, "with one hand holding [her] down by the throat, [LaChance] slapped [her] . . ." *See supra* at 3. Although Lane testified LaChance did not choke or strangle her, she maintained he impeded her breathing by sitting on top of her with his entire weight while pressing down on her collarbone/lower neck/clavicle area. *See supra* at 3-4, 6. As a result, Lane's vision was impeded because she felt "faintish," "saw stars" and "white spots," and believed she could have passed out. *See supra* at 3-4. At the emergency room, Lane reported "airway, breathing, circulation and neuro," concerns and "neck and back" tenderness. *See supra* at 5. Flowers testified Lane told him that LaChance held "her down on the bed with one hand around her throat," while hitting her so hard that she saw "stars" and became dizzy and nauseous. *See supra* at 4. LaChance "cut her airway off causing her to almost pass out." *Id.* This Court presumes the jury resolved any conflicts in the evidence in favor of the prosecution as to where LaChance pressed Lane's neck, particularly where, as here, the record reflects Lane demonstrated this area for the jury. *See Davis*, 384 F.3d at 639 (citing *Jackson*, 443 U.S. at 326.)

On this evidentiary record, a rational jury could find the State proved strangulation beyond a reasonable doubt for purposes of the conviction for domestic battery by strangulation, as required by *Jackson*. LaChance is not entitled to relief on Ground III.

**4.      Ground IV: Substantial Bodily Harm**

The state court's application of *Jackson* to the evidentiary record for the conviction for domestic battery causing substantial bodily harm was objectively reasonable.

The elements of the crime of domestic battery causing substantial bodily harm are discussed above. *See supra* at 13-14. There is no dispute Lane and LaChance were in a domestic relationship or that LaChance battered Lane. *See supra* at 2-6. The evidentiary record is sufficient for a rational jury to find the State proved substantial bodily harm, *i.e.*, "prolonged physical pain," beyond a reasonable doubt. As stated above, "the phrase

'prolonged physical pain' must necessarily encompass some physical suffering or injury that lasts longer than the pain immediately resulting from the wrongful act." *Collins,* 203 P.3d at 92-93. On this evidentiary record, a rational jury could find the State proved Lane suffered prolonged physical pain and that LaChance committed domestic battery causing substantial bodily harm beyond a reasonable doubt.[11] *See supra* at 2-6.

The state appellate court's application of *Jackson* to the trial evidence was objectively reasonable, and LaChance is not entitled to relief on Ground IV.

## VI.    CONCLUSION

It is therefore ordered that Petitioner Darren LaChance's petition for writ of habeas corpus (ECF No. 1) is granted in part and denied in part on the grounds remaining before the Court. Ground I(a) is granted as to the conviction for domestic battery by strangulation, as further specified below. Ground I(b) is denied and dismissed on the merits as to the conviction for domestic battery causing substantial bodily harm. Grounds II, III, and IV are dismissed with prejudice on the merits.

It is further ordered that LaChance's petition for writ of habeas corpus (ECF No. 1) is conditionally granted in part and that, accordingly, the conviction of LaChance for domestic battery by strangulation on Count I in the judgment of conviction, as amended, in Case No. CR12-1025 in the Second Judicial District Court for the State of Nevada hereby is vacated, and LaChance will be released from any and all custody, restraint, and/or continuing consequences from the conviction on said Count I, within 30 days of the later of the conclusion of any proceedings seeking appellate or *certiorari* review of the Court's judgment, if affirmed, or the expiration of the delays for seeking such appeal or review, unless the State files a written election in this matter within the 30-day period to retry LaChance for that offense and thereafter commences jury selection in the retrial within 120 days following the election to retry LaChance, subject to reasonable request

---

[11]The definition of "prolonged physical pain" under *Collins,* does not require a victim be admitted to an intensive care unit, lose significant amounts of blood, undergo surgery, or even fill a prescription, as LaChance alleged in the Petition. (ECF No. 1 at 23.)

for modification of the time periods in the judgment by either party pursuant to Rules 59 and 60.

It is further ordered that a certificate of appealability is denied as to all grounds and/or partial grounds upon which the Court has denied relief. Reasonable jurists would not find the Court's rejection of the remainder of Ground I or rejection of Grounds II through IV debatable or wrong. Reasonable jurists would not find it debatable whether the district court was correct in its procedural ruling dismissing Ground V as failing to state a cognizable claim for federal habeas corpus relief, for the reasons stated in ECF No. 29.

The Clerk of Court is directed to enter judgment, accordingly, conditionally granting the petition for a writ of habeas corpus (ECF No. 1) in part as provided in the first two disposition paragraphs above verbatim and close this case. It is the Court's intention that the judgment entered pursuant to this order will be a final judgment. Final judgment is entered subject to a possible later motion to reopen the matter to enter an unconditional writ if then warranted, as a matter of enforcement of the judgment.

The Clerk of Court is further directed to substitute Perry Russell for Respondent Harold Wickham.

The Clerk of Court is further directed to send a copy of this order and the judgment to the Clerk of the Second Judicial District Court, in connection with that court's Case No. CR12-1025.

DATED THIS 14th Day of September 2021.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE